## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

Mayor and City Council of Cumberland
57 North Liberty Street
Cumberland, MD 21502

       *Plaintiff*,

    v.

                                        Civil Action No. _____

CSX Transportation, Inc.

Serve Resident Agent:
The Corporation Trust, Incorporated
2405 York Road
Suite 201
Lutherville Timonium, MD 21093-2264

       *Defendant.*

## COMPLAINT FOR DECLARATORY JUDGMENT, PRELIMINARY AND PERMANENT INJUNCTION, AND DAMAGES

1.      The Mayor and City Council of Cumberland (the "City") file this action to enforce their easement and contract rights to begin critical repair work on City sewer lines beneath a rail yard owned by CSX Transportation, Inc.'s ("CSX") in Cumberland, Maryland.  Video inspections of the sewer lines show that repairs are needed urgently to prevent a rupture that could cause a major public health and environmental disaster.  In breach of its contract, easement, and other legal obligations, CSX refuses to grant the City access to its property for this necessary work.  The City files this action to seek access to the sewer lines to begin the urgently needed repair work before there is a disastrous rupture of the lines and to recover damages caused by CSX's breaches.

2.      The City built the sewer in approximately 1957 pursuant to easements and contracts

with CSX's predecessors in title that granted the City the right to access, repair, and maintain the sewer lines. Also in the late 1950s, and with full knowledge of those easements, CSX's predecessor constructed a rail switching yard over the sewer lines (the "Yard"), burying and/or modifying several of the manhole access points that are necessary to perform maintenance on, and repairs to, sewer lines. A map showing the approximate location of the sewer lines and manholes is attached as Exhibit 1.

   3. In 2016, CSX gave the City limited access to the Yard to perform video inspection of the sewer lines. Those inspections revealed cracking, intrusions, blockages, and leaking in almost all segments of line beneath the Yard that the City was able to inspect. Additional video inspections in 2025 confirmed those issues and showed further deterioration of the lines.

   4. The City was not able to inspect all segments of the lines, however, because CSX's predecessors buried several of the manholes and the City was not able to locate them. Without access to all of the manholes, the City cannot complete the inspection or perform the necessary repairs.

   5. If left unrepaired, the lines are subject to collapse and failure, which would harm the people and communities of Cumberland. More specifically, a collapse or failure of the lines could cause sewage to back up into houses and businesses north of Industrial Boulevard; require closure of Allegany County's only hospital; require closure of Allegany College of Maryland; cause sewage overflows into the Potomac River at the Evitts Creek Screening and Pumping Station; and/or potentially stop the flow of sewage to the City's treatment plant, cutting off sewage service to thousands of City and Allegany County residents. A collapse or failure could also impact CSX's facilities and services by causing the land under the Yard to subside and causing sewage to overflow onto the Yard. In any case, the result would be a public health and

environmental disaster.

6.      Despite that imminent danger, CSX refuses to allow the City access to its Yard to locate the buried manholes and perform the necessary repair work.  CSX contends that the City's work will impair CSX's operations on the Yard.  CSX thus suggests that the City should build a new sewer line by boring a tunnel beneath the Yard, bypassing the existing lines for which the City has easement and contract rights.

7.      However, the City's work in the Yard will be temporary and of short duration.  That work would not prevent rail operations from continuing while the City performs the work.  Indeed, CSX's own staff at the Yard have told the City that the City's work could be accommodated without undue interference with CSX operations.  Even if the inspections and repairs were to cause some interference, though, any such interference would be because CSX and its predecessors buried the manholes and placing tracks over or close to the manholes despite knowledge of the sewer system and manholes and of the City's easement rights.

8.      The City files this suit to compel CSX to honor its legal obligations by granting the City access to the Yard to locate all of the manholes, complete the inspection, and make the necessary repairs to the manholes and sewer lines in order to prevent an environmental and public health disaster, and for damages caused by CSX's breach.  In the alternative, the City seeks damages in the amount necessary to relocate the sewer lines.

## THE PARTIES

9.      Plaintiff City is a Maryland municipal corporation and is authorized to bring the causes of action asserted herein.  MD. CODE ANN., Local Gov't § 4-103(b)(2).  The City is located within Allegany County, Maryland, at 57 North Liberty Street, Cumberland, Maryland 21502.

10.     Defendant CSX is a resident of Florida with its principal place of business in

Jacksonville, Florida.  CSX is a Class I railroad providing freight railroad transportation services nationwide.  CSX owns and operates the Yard and is the successor in title and interest to the entities that granted the City the right to construct, use, and maintain the sewer lines below the Yard, including the Baltimore and Ohio Railroad (the "B&O").  CSX is headquartered at 500 Water Street, Jacksonville, Florida 32202.  Going forward the term "CSX" will refer to CSX and its predecessors, including the B&O.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because CSX and the City are citizens of different states and the amount in controversy exceeds $75,000.

12.    Venue is proper in the Court because the events giving rise to this lawsuit, including those occurring on the Yard, occurred in this District, and because the property that is the subject of this action, including the City's sewer system, is located in this District.

## GENERAL ALLEGATIONS

**The City Obtained Easement Rights to Build and Maintain Its Sewer System.**

13.    In the mid-1950s, the City built a sewer system to convey sewage and wastewater from the City to a wastewater treatment facility located south of the railroad tracks, near the North Branch of the Potomac River.  The sewer system as a whole consists of approximately 105 miles of sewer lines and related pumping facilities.  The City's sewer system is a combined stormwater and sewage system that collects both sewage and wastewater from residences and businesses and stormwater runoff from streets, basements, and other sources.

14.    A critical element of the system is a series of large, 30-inch and 24-inch concrete lines that transport combined sewage, wastewater, and stormwater from the Evitts Creek Pumping

Station, the North Branch Pumping Station, and certain drainage areas in the City immediately north of Industrial Boulevard to the wastewater treatment plant, passing beneath what is now the Yard. A copy of the "as built" plans of the relevant portions of the City's sewer system is attached as Exhibit 2.

15.     Integral to the sewer system are manholes that were constructed at the surface of what is now the Yard. The manholes provide access to the sewer lines for inspection, maintenance, and repair work. The City built six manholes on what is now the Yard, designated as Manholes 2, 3, 4, 5, 5A, and 8, each of which was 36-inches wide, the diameter necessary to allow access to the lines. A seventh manhole, referred to as Manhole 7, was apparently built by CSX at some later point in time. The sewer system also includes Manholes 1 and 6, which are located north of the Yard beneath or near Industrial Boulevard.

16.     At the time the City built the sewer system, the property that is now the Yard consisted of three separate parcels, owned respectively by the B&O, the Pen-Mar Brick and Supply Company ("Pen-Mar Brick"), and the Avirett family. Exhibit 3 shows the approximate location of the sewer lines in relation to the property formerly owned by the B&O, Pen-Mar Brick, and the Avirett family. At the time the sewer system was built, the lines were placed approximately 8–10 feet below the surface. To construct and maintain the sewer lines, the City obtained easements from each of these previous owners on somewhat different terms.

17.     Manholes 2, 3, and 8, and surrounding sewer lines, are located on property formerly owned by the B&O. In an agreement dated September 1, 1955 (the "B&O Agreement"), the City and CSX agreed to allow the City "to construct, maintain and use" 30-inch and 24-inch sewer lines beneath property then owned by the B&O. A true and correct copy of the B&O Agreement is attached as Exhibit 4. The B&O Agreement expressly granted the City the right to "maintain, use,

change and remove" the sewer lines, subject to specific and express conditions regarding notice and expenses and conditions to limit any interference with, or endangerment to, the railroad's operations and personnel. The B&O Agreement includes a map of the City's sewer lines beneath the railroad's property depicting the locations of several of the manholes.

18.     Manholes 4, 5A, and 7, and surrounding lines, are located on property formerly owned by Pen-Mar Brick. By Deed of Easement dated April 26, 1957 (the "Pen-Mar Brick Easement"), the principals of Pen-Mar Brick granted the City an easement "in perpetuity . . . for the installation of, laying of, reconstruction, repaid [sic] and relocation of a thirty (30) inch sanitary interceptor sewer, incident to the Cumberland Sewage Disposal Project, the location of which easement area shall extend ten (10) feet on either side of the hereinafter described centerline, for the entire distance of the centerline . . . ." A true and correct copy of the Pen-Mar Brick Easement is attached as Exhibit 5. The Pen-Mar Brick Easement was recorded in Liber 295, page 15 among the land records of Allegany County. CSX's predecessor acquired the property burdened by the Pen-Mar Brick Easement on or about November 29, 1957, pursuant to a deed recorded in Liber 295, page 41 among the land records of Allegany County.

19.     Manhole 5 and surrounding lines are located on property formerly owned by the Avirett family. By deed dated December 18, 1956, recorded at Liber 284, page 140 among the land records of Allegany County, the Aviretts purported to convey to CSX the portion of their property on which Manhole 5 and connected sewer lines are located. CSX was aware of the existence of the City's sewer lines and manholes on the Avirett property and of the need for the City to gain periodic access to the manholes to perform maintenance on the sewer lines.

20.     Notwithstanding that earlier action, James Alfred Avirett and John Williams Avirett, 2d, Trustees, entered into a deed and agreement dated November 15, 1962 (the "Avirett

Easement"), which granted the City an "easement in perpetuity for the purpose of operating, maintaining and repairing the force-main and sewer line in, on or under the property of [the Aviretts], said easement to be 20 feet wide, 10 feet on each side of the centerline and extending through the property of [the Aviretts] for a distance of 2788.8 feet, as shown on the Plat Map . . . ." A true and correct copy of the Avirett Easement is attached as Exhibit 6. The Avirett Easement was recorded in Liber 353, page 444 among the land records of Allegany County.

21.      On information and belief, the City relied on permission and property rights from the Aviretts to construct and maintain a portion of the sewer system, including Manholes 5, 6A, and 6. Alternatively, at all times during and after the construction of the sewer system the City has made adverse, exclusive, and uninterrupted use of the portions of the portion of CSX's property formerly owned by the Aviretts for its sewer system.

### The Railroad Constructed a Large Switch Yard Over the Sewer Lines and Impaired Access to the Manholes.

22.      When the City initially constructed the sewer line, only a single B&O rail line crossed the sewer line in one location and there were no tracks over or in close proximity to any of the manholes.

23.      Beginning in or about 1956 or 1957, CSX began to plan and construct a large switching yard on the then-vacant land over the City's sewer system and acquired property from Pen-Mark Brick and the Avirett family to do so. CSX made substantial changes to the property, relocating its main rail line northward to its current location just south of Industrial Boulevard, adding a number of additional "long tracks" parallel to the main line, and constructing a large "hump" switch yard over the sewer lines. The "hump" is an elevated section that allows the railroad to let gravity pull cars down the tracks to the desired switching track to be joined to a larger train for shipment. In constructing the hump switch yard, which became the Yard, CSX

7

placed substantial fill material over the sewer lines.  In the area of Manhole 4, CSX placed approximately 16 to 20 vertical feet of fill material.

24.    CSX was aware of the City's sewer system, the location of the sewer lines and manholes, and of the City's right to repair and maintain the sewer system.  Nevertheless, CSX designed and built the Yard in a way that placed a dense network of switching tracks and other railroad infrastructure over Manholes 2, 3, 4, 5A, and 7, as shown in Exhibit 1.  However, CSX failed to design or build the Yard in a way that preserved access to the manholes.

25.    Moreover, when it built the Yard, CSX failed to extend all of the manholes to the new surface grade level created by CSX's fill material, essentially burying those manholes.  CSX did not mark the location of those manholes on the surface or make any apparent effort to preserve the City's ability to locate or access those manholes.  Further, CSX apparently tried to extend some manholes to the surface, but did so by building an extension of approximately 18-inches, less than the 36 inches required for access.  Even where manholes were extended to, or close to, the surface with a 36-inch opening, CSX failed to leave sufficient space between the manholes and the tracks to allow the City access to the manholes without the potential to limit rail operations on the adjacent tracks.

26.    As a direct result of the way CSX designed and built the Yard, CSX has made it more difficult, expensive, and time consuming to locate and repair the manholes and to repair the sewer lines themselves.  In addition, CSX's design and construction of the Yard will make minimizing interference to rail operations more challenging.  CSX could have avoided those additional costs and impacts by taking due care in the design and construction of the Yard to preserve the City's easement and contract rights.

**The City Needs to Repair the Sewer Lines.**

27.    Because the City's sewer system conveys both stormwater and sewage it experiences Combined System Overflows ("CSOs") during high precipitation events when the combined volume of sewage, wastewater, and stormwater runoff exceeds system capacity. CSOs are not permitted under the Clean Water Act. The City has been working with the Maryland Department of the Environment (the "Department") to address the CSO problem, including negotiating the terms of a modified consent decree. Without a consent decree, the City is potentially subject to penalties and other enforcement action. As part of its ongoing effort to address the CSO problem, the City needed to determine whether water was infiltrating the sewer lines. Such infiltration and inflow adds to the total volume of water that needs treatment, potentially overloading the system and causing CSOs. To fully address the CSO issue, the City would need to stop any infiltration or inflow into the sewer lines.

28.    In November 2016, CSX granted the City limited access to the Yard to attempt to locate the manholes and use them to access the sewer lines for inspection with a robotic video system.

29.    The City's inspection found that CSX had buried all of the manholes in the Yard to some extent. Manholes 2, 3, 5 and 7 were found less than 12 inches from the surface.

30.    Despite considerable effort, the City was not able to locate Manhole 4. The City's engineering consultants hand-dug four feet below grade in the expected area of Manhole 4 but were unable to locate it. Although the City was able to view Manhole 4 by video camera from inside the sewer, the City was unable to locate the top of the manhole, determine its width at the top of the manhole, or assess the manhole's condition.

31.    The City was also not able to locate Manhole 5A. The expected location of Manhole 5A was occupied by trains during the City's on-site inspection in 2016. As discussed

below, the City was also not able to locate Manhole 5A during its August 2024 visit to the Yard. The 2016 video inspection of Manhole 5A from within the sewer line does not show how the manhole was extended or its condition near the surface because wooden boards, apparently placed by CSX or its predecessors, block the view from the sewer line to the top of the manhole.

32.     In addition to difficulties locating all of the manholes, the City discovered that when CSX attempted to bring Manhole 3 up to surface grade it did so by adding an extension that is only 18 inches in diameter.  Manhole 7 is also only 18 inches wide at the surface. The City has no records of Manhole 7 being constructed so it appears that CSX or its predecessors added Manhole 7 and connected lines for its own purposes.  During site visits, City personnel were able to view the lid to Manhole 7 and were able to view several drain pipes penetrating the manhole in the top 5 feet of the manhole, suggesting that CSX is discharging stormwater directly into the City system which further burdens the system during rain events.  As a result, the City will have to incur additional expense to widen the extensions to the necessary 36-inch width.  Manholes 2 and 5 appear to retain their original 36-inch width.

33.     Despite those issues, the City was able to inspect most of the segments of the sewer lines beneath the Yard using a robotic video camera system.  That inspection revealed extensive cracking, intrusions, blockages, and leaking in almost all segments of the sewer line.  The City's engineers have determined that those lines require extensive repair and rehabilitation work to fully address the CSO issue and to prevent a rupture or failure.

34.     However, the City was unable to inspect the segment of line between Manholes 4 and 8 due to high flow, the slope of the line, and lack of access to Manhole 4.

35.     During the November 2016 inspection, the City's engineers discussed with CSX employees who work at and operate the Yard how to coordinate the work needed to locate and

repair the manholes with CSX operations. Those employees indicated that they could manage Yard operations in a manner that would allow the City to perform the repair work without unduly disrupting Yard operations.

### Repairing the Lines Requires Access to the Yard.

36.    Following the 2016 inspection and given the need to repair the leaks, cracks, and other issues with the lines, the City's consultants evaluated the City's options in a report titled "Evaluation of CSX Rail Yard Sewer Rehabilitation, Final Engineering Report" dated April 2018 ("2018 Final Engineering Report"). The 2018 Final Engineering Report determined that the most cost-effective, and effective, method to repair the lines is to insert a specific type of liner, called a "cured-in-place pipe," or "CIPP," into each line. The CIPP repair method requires inserting a resin-impregnated tube into a damaged line through an existing manhole and then inflating the tube to line the original pipe. To perform the CIPP repairs, the manholes must be raised to current surface grade and retain their original 36-inch width. The CIPP is installed in segments from manhole to manhole, requiring access to all manholes. If the City is unable to locate a manhole, it will not be able to install the CIPP for any section of the sewer line connected to that manhole.

37.    Access to all of the manholes is necessary, but Manhole 4 is particularly critical to the City's repair work because it is located at the junction of a "Y" in the sewer lines and thus provides necessary access to three of the sewer lines, including the connection to the treatment plant. The City also needs to know the precise location of all of the manholes to develop a workplan that minimizes the impact of the sewer repair work on CSX's operations.

### CSX Refuses to Allow the City Further Access to the Yard.

38.    Based on the recommendations in the 2018 Final Engineering Report and the need to locate, evaluate and repair the manholes in order to perform the CIPP repairs, the City submitted

a Right of Entry Application to CSX in September 2020 seeking access to the Yard to locate Manholes 4 and 5A and to install the CIPP. By letter dated July 7, 2021, CSX summarily denied that request. A copy of the July 7 letter is attached as Exhibit 7. CSX did not provide any basis for its decision and did not address the City's easement rights. CSX stated only that, "[a]fter review of the proposed access and potential disruptions to CSX operations, CSX rejects the proposed access." Ex. 7. CSX further recommended that "the City explore other options to rehabilitate the sewer or relocate the sewer outside the active switching yard tracks." *Id.* CSX did not provide any suggestion as to how that could be accomplished.

39.    On September 10, 2021, the City again requested access to the Yard and provided CSX with a copy of the 2018 Final Engineering Report that details the need to perform repairs to the sewer system. By letter dated October 29, 2021, CSX reaffirmed its decision to deny access without any further discussion, and again with no reference to the City's easement rights. CSX noted that the 2018 Final Engineering Report had considered an alternative that would require relocating the entire sewer line and installing a new sewer line beneath the Yard further to the west, which CSX stated "might be a feasible alternative." However, CSX also noted that further analysis was needed to confirm feasibility and that the City would have to seek additional permission from CSX to build that alternative. As discussed below, the City has rejected that alternative as not practicable for a number of reasons.

**Further Efforts to Inspect the Lines and Locate the Manholes.**

40.    Since October 29, 2021, City officials made several efforts to discuss with CSX how to accommodate the City's work. On October 13, 2022, the City again wrote to CSX to request access and informed CSX of the collapse of a section of 18-inch clay sewer pipe on Mechanic Street in the City. This pipe was installed in approximately 1935 and exhibited interior

surface cracking similar to that observed in many of the lines beneath the Yard. The sewer collapse caused sewer back-ups into residents' homes, who filed a claim against the City. The City cautioned that if action is not taken to repair the sewer lines beneath the Yard, a similar collapse is likely. When CSX did not respond, the City sent a second email on November 22, 2022, asking if CSX had considered the issue in light of the information about the collapse. CSX did not respond to that email.

41.     In the spring of 2024, the City again reached out to CSX to obtain access to the Yard, and CSX agreed to further discussions. To facilitate those discussions, the City and CSX entered into a Tolling Agreement, dated as of May 2, 2024, which was subsequently extended by four amendments to June 30, 2025.

42.     On August 20, 2024, the City met with CSX at the Yard to discuss access issues. CSX allowed City representatives visually inspect portions of the Yard, including the area where Manholes 4 and 5A should be. The City was still not able to locate Manholes 4 or 5A. In addition, City representatives were not able to see Manhole 3, which it had previously located in 2016. CSX appears to have buried Manhole 3 again. The City was not able to determine how far below grade Manhole 3 is now.

43.     Additionally, during that site visit it appeared that CSX had removed some of the tracks near Manholes 3 and 5A, and possibly 4, creating more space in which the City could work without interfering with CSX's use of adjacent tracks. CSX did not inform the City of that work or invite the City onto the Yard to look for the buried manholes. However, based on information learned in early 2025, it appears that CSX had added new tracks in that area, making access more difficult.

44.     As part of the Tolling Agreement, CSX agreed to pay for video inspections of the

13

sewer lines using its own consultant. That inspection took place over several days in January 2025. CSX gave the City a copy of the video feed and the City was able to observe the condition of most segments of the lines beneath the Yard. However, due to partial blockages in the lines CSX's consultants were not able to video all the section between Manhole 8 and Manhole 4, and Manhole 2 and Manhole 4.

45. Based on the video, the City noted additional cracks and leaks in the lines since 2016 making the need to perform the CIPP repairs all the more urgent. The 2025 video inspection did not help locate Manholes 3, 4, and 5A on the surface.

46. CSX continues to deny the City access to the Yard to locate the buried manholes and perform the necessary repairs to the manholes and the sewer lines.

**The CIPP Repair Process**

47. Before it can begin the CIPP repair work itself, the City must locate all manholes and assess their condition to determine what repairs will be needed to perform the CIPP installation, design and obtain permits for that work, and then perform that work. After that, the City can perform the actual CIPP repair work.

48. The City expects to take 1 to 3 weeks to locate and evaluate Manholes 3, 4, and 5A, evaluate the manholes previously located, and complete video inspection of the sewer line segments it was unable to see on video previously.

49. Once the City locates and evaluates the manholes, the City will develop specific construction plans and procurement documents to repair the manholes and portions of the sewer lines if needed. The City estimates that it will take approximately 18 to 24 months to generate the construction and procurement documents for the sewage-line repairs, including necessary permits and approvals. Such construction and procurement documents will ultimately require approval by

the Department and the Maryland Board of Public Works, and possibly among other entities. During that time the City will need only periodic access to the Yard to obtain survey, geotechnical and environmental information in order to complete design and regulatory work. This work can be scheduled in accordance with CSX's standard practices for accommodating such activities.

50.     Once fully approved and permitted, the complete repair project, including both repairing the manholes and installing the CIPP is expected to take 8 to 12 months, mostly due to the need to construct a pump system north of Industrial Boulevard to divert sewer flow away from the lines beneath the Yard. Only a small portion of this estimated time would occur on the Yard. The City estimates it will need only 6 to 8 weeks to complete the repairs in the Yard, including site preparation, manhole repairs, and installation of the CIPP. The length of time for the manhole repair work is due to the way CSX and its predecessors designed and built the Yard and buried the manholes, which make access and repairs more difficult, expensive, and burdensome than they otherwise would have been, and further require the City to take additional steps, described below, to mitigate interference with CSX's operations. The installation of the CIPP is estimated to take only 4 to 5 days of that time.

51.     The City has identified a number of ways to reduce the sewer repair work's impacts on CSX's operations. Generally, the City will cooperate with CSX to schedule work to minimize impacts on CSX's operations. More specifically, the City proposes to use timber mats to build temporary roads across existing tracks that will allow trains to continue to operate while the City is on-site. The City also proposes to build "doghouse" manholes adjacent to several existing manholes to access the existing manholes laterally without interfering with CSX rail lines. The City would consider additional measures and has offered to work with CSX to develop and implement a plan to minimize impacts on CSX's operations.

15

**There Is No Practical Alternative to the CIPP Repairs.**

52.     Rather than allow the City to exercise its contract and easement rights to access, repair, and use the manholes, CSX demands that the City build a new sewer line and bypass the existing sewer lines and manholes.  The proposal poses a number of obstacles that will be difficult, time-consuming, and expensive to overcome, if they can be overcome at all.

53.     Due to the presence of the Yard, traditional open trench construction is not possible. The only possible alternative to CIPP repair would be to bore a new tunnel to connect the pumping stations and lines north of Industrial Boulevard to the line running from Manhole 8 to the City's wastewater treatment plant.  That would require boring a 72-inch diameter tunnel to install approximately 1,175 linear feet of 36-inch sewer main across CSX's property and installing new or modified 30-inch, 24-inch, and 21-inch pipelines north of CSX's property along Industrial Boulevard to collect the outflows from existing lines and redirect them to the new line.  Depending on the exact location of the new line, the City may also need to build one or two new pumping stations.

54.     The boring process would also require digging large and deep pits at either end of the tunnel to accommodate the boring machinery.  The north-end pit would have to be located on private property, requiring the City to acquire the necessary property rights.  The south-end pit would have to be constructed on or immediately adjacent to the C&O Canal National Historical Park, which would require the approval of the National Park Service.  Requesting that approval would trigger environmental review under the National Environmental Policy Act, the National Historic Preservation Act, and other applicable laws, with no guarantee that the Park Service would ultimately approve the project.

55.     In addition to obtaining the property rights and permits to do the boring, there are

other uncertainties and obstacles that make the boring alternative impractical, and perhaps infeasible. First, the City will have to perform test boring to determine if the slope, soil, fill, and bedrock conditions will allow for boring. Second, the estimated cost of a new pipeline—estimated to be at least $28 million—is over three times the estimated cost of repairing the existing lines. The amount is too high for the City and its ratepayers to plausibly bear, nor should they be required to bear it in view of the City's rights to access and repair the existing sewer lines and manholes. Other than contributions from CSX, the City is not aware of another plausible source of funds. Third, planning, permitting, and funding the new pipeline would add years to the project, during which time the risk of a failure of the existing lines would continue to increase. Fourth, in addition to obtaining the necessary easement rights from CSX, construction of the pipeline would pose similar operational challenges CSX asserts the CIPP work would cause because the City will need access to the Yard to conduct test boring before and during construction.

### There Is An Urgent Need to Perform the CIPP Repairs to Avert an Environmental and Public Health Disaster.

56.     As discussed above, the City has identified cracks, intrusions, and other issues with the existing sewer lines that require repair to prevent a catastrophic failure of the system. Given the nature of the issues with the lines, there is a possibility of failure at any time. The longer the repair work is delayed, the greater the risk of failure because of the progressive nature of the cracking and intrusions and the stress of surface vibrations and storm events on the sewer pipes. The October 2022 collapse of a similar pipe, exhibiting similar cracks to those seen on the pipes beneath the Yard, underscores the need for immediate action in order to avoid an environmental and public health catastrophe.

57.     Time is also of the essence because, at a certain point, the pipes will become too distressed to perform the repairs using the CIPP method. Moreover, delays in the work jeopardize

the City's ability to obtain the necessary funding for the work. The State of Maryland has previously awarded the City certain grants to help fund the sewer rehabilitation work, which work has been stalled by CSX's refusal to grant access to the Yard. If the City cannot show that it is making progress on the repair project, the State can withdraw those funds and decline to award future grants. Further, the City has operated the sewer system under a consent decree with the Department while it addresses the CSO issues. That most recent consent decree expired in October 2023, and the City is working with Department to enter into a revised consent decree. If the Department determines that the City is not making progress on the overall project, it could decline to enter into a further consent decree or insist on terms more adverse to the City, further jeopardizing the City's ability to obtain funding for the sewer-repair project. Further delays in the necessary repair work could subject the City to fines and penalties, including pursuant to any future consent decree with the Department. Without substantial funding from state and federal sources, the City would be forced to impose nearly all the costs of the work on the system's ratepayers, placing an enormous and unaffordable financial burden on every resident of the City, as well as on the City itself.

58.    Finally, delay has substantial financial consequences to the City due to increased construction and material costs. In 2018, the City estimated that the cost of the CIPP work alone would be approximately $5 million. That cost is now estimated to be approximately $7.5 million, a 50% increase, subject to further revision as the City engineers the project. Given current inflation rates and supply-chain issues, the City expects that further delay will lead to further cost increases.

59.    Failure to perform that work could have catastrophic consequences. A blockage in the line, whether due to a collapse or otherwise, will cause sewage to back up into houses. Further, due to the nature of the cracking, intrusions, and other issues, the lines could collapse, effectively

stopping the flow of wastewater from the City to the treatment plant. If the City is unable to treat wastewater, it will be unable to provide sewage service to approximately 7,000 sewer customers situated in the City and certain other portions of Allegany County, including the County's only hospital and other vital facilities. Further, a rupture would cause untreated sewage to spill into the surrounding ground, including land owned by CSX, and potentially contaminate groundwater, Evitts Creek, the C&O Canal, and the Potomac River.

## COUNT I:
## DECLARATORY JUDGMENT

60.    The City incorporates by reference the allegations of Paragraphs 1-59 above as if restated here in full.

61.    There is a present controversy between the City and CSX, regarding CSX's obligations to grant the City access to the Yard to perform the inspections of, and repair work on, the manholes and sewer lines as described above, within the meaning of Section 3-406 of the Courts and Judicial Proceedings Article of the Maryland Code.

62.    CSX denies that it is obligated to allow the City access to the Yard to maintain, repair, and use the sewer lines and manholes. CSX contends that the City must construct a new sewer line rather than repair the existing sewer lines despite the City's contract and easement rights. CSX further contends that the repair work will unreasonably interfere with the operation of the Yard.

63.    CSX must allow the City access to the Yard pursuant to the B&O, Avirett, and Pen-Mar Brick easements and/or by the prescriptive easement rights the City has acquired by the adverse, exclusive, and uninterrupted use of the sewer system since at least 1957, to maintain and use the sewer lines and manholes to prevent a catastrophic failure of the sewer system. CSX must also provide access to the Yard pursuant to an easement by necessity to access its sewer lines. The

City can perform the work and access the manholes and sewer lines without unreasonably interfering with CSX's operation of the Yard.

64.    The City seeks a declaration that it is entitled to access the Yard to inspect, maintain, and repair the sewer system.

65.    In the alternative, CSX is estopped from denying that, with respect to the former Avirett property, the City has easement or other rights to construct, operate, repair, and maintain the sewer system, including Manhole 5 and the connected segments of the sewer lines, because CSX was aware that the City constructed and maintained the sewer system under and on the former Avirett property and never objected to the construction, operation, or maintenance of the sewer system thereon based on the City's alleged lack of legal right to do those things.

66.    Resolution of this dispute is necessary to prevent a catastrophic failure of the sewer system and to prevent the City from being compelled to acquire new easement rights and construct a new segment of the sewer system, all of which would be at substantial additional cost and may not be possible.

67.    Accordingly, the City seeks a declaration that the City has rights pursuant to contract, easements, and/or an easement by necessity to access to the Yard to (1) locate and assess the condition of all manholes and sewer lines on or beneath the Yard, and (2) perform the necessary repairs to all of the manholes and sewer lines on or beneath the Yard.

**COUNT II:**
**BREACH OF CONTRACT AND EASEMENTS**

68.    The City incorporates by reference the allegations of Paragraphs 1-67 above as if restated here in full.

69.    Pursuant to the contracts and easements with the B&O, the Aviretts, and Pen-Mar Brick, CSX has entered into contracts with, and granted utility easements to, the City that, among

20

other things, grant the City the right to access, maintain, and use the sewer lines and manholes shown in Exhibit 1.

70.    CSX has breached each of those contracts and easements by constructing the Yard in a manner that interferes with and impairs the City's ability to access, maintain, and use the sewer lines and manholes despite CSX's knowledge of the City's contract and easement rights to access, maintain, and use those sewer lines and manholes.

71.    CSX has breached each of those contracts and easements by denying the City access to the Yard so the City can perform necessary maintenance and repairs to the sewer lines and manholes and prevent a catastrophic failure of the sewer system.

72.    CSX has breached the covenant of good faith and fair dealing implied into contracts and easements as a matter of law by constructing the Yard in a manner that materially impairs the City's ability to access, maintain, and use the sewer lines and manholes, despite knowledge of the City's easement rights to access, maintain, and use the sewer lines and manholes.

73.    CSX has further breached the covenant of good faith and fair dealing implied into contracts and easements as a matter of law by denying the City access to the Yard to perform necessary maintenance and repairs to the sewer lines and manholes, instead suggesting that the City abandon existing manholes and lines and construct new ones elsewhere, all solely due to the manner in which CSX built the Yard despite its knowledge of the City's easement rights to access, maintain, and use the sewer lines and manholes.

74.    CSX's demand that the City build a replacement line is a breach of CSX's obligations under the City's contract and easement rights, which require CSX to allow the City to access, maintain, and use the existing lines and manholes, and is a repudiation of CSX's obligations and duties under the easements.

75.     The City has suffered injuries and damages as a result of CSX's breaches of the contracts and easements in an amount to be proven at trial, including the cost to repair several of the manholes and to construct doghouses to access several of the manholes, and to perform related work, all of which work is necessary because of the way CSX constructed the Yard.  The City has also incurred injury and damage because of increased costs caused by CSX's delay in granting the City access to the Yard.  The City believes those total costs and damages to be in excess of $20 million.

### COUNT III:
### SPECIFIC PERFORMANCE

76.     The City incorporates by reference the allegations of Paragraphs 1-75 above as if restated here in full.

77.     As described above, and incorporated herein by reference, CSX has breached its contracts and easements with the City.

78.     The City is ready, willing, and able to perform and to immediately begin work, and has repeatedly asked CSX for access to the Yard to perform such work.  CSX has denied those requests and refused to grant the City access to the Yard.

79.     Access to the Yard to perform that maintenance and those repairs is necessary to enable the City to obtain the benefits of its contracts with CSX.

80.     Monetary damages and other legal remedies are inadequate to compensate the City for the destruction of its easement rights and its inability to access, maintain, repair, and use the sewer system and manholes as required by its contracts with CSX.

81.     The public interest strongly favors allowing the City to access, maintain, repair, and use the sewer system and manholes to prevent a catastrophic failure of the sewer system, the flooding of homes with untreated sewage, the closure of UPMC Western Maryland Hospital,

Allegany County's only hospital, sewage spills into the Potomac River, the closure of Allegany College of Maryland, and the loss of water and sewer service to a substantial portion of the City of Cumberland.

82.    CSX would suffer only modest, temporary impacts, if any, from the City's work on the sewer lines and manholes and such work would not materially interfere with CSX's operations.

83.    The City is entitled to an order of specific performance requiring CSX to grant the City access to the Yard to (1) locate and assess the condition of the manholes and sewer lines on and beneath the Yard, (2) perform the CIPP installation work, and associated work to the manholes, necessary to repair all of the sewer lines and manholes on or beneath the Yard.

**COUNT IV:**
**INJUNCTION**

84.    The City incorporates by reference the allegations of Paragraphs 1-83 above as if restated here in full.

85.    CSX has breached its contracts and easements with the City by denying the City access to the Yard to perform necessary maintenance and repairs to the sewer lines and manholes and by constructing the Yard in a manner that materially impairs the City's ability to access, maintain, repair, and use the sewer lines and manholes, despite CSX's knowledge of the City's easement rights to access, maintain, repair, and use the sewer lines and manholes.

86.    Further delay in granting the City access to the Yard is likely to result in irreparable injury to the City and the residents of the City.

87.    Monetary damages and other legal remedies are inadequate to compensate the City for the destruction of its easement rights and its inability to access, maintain, repair, and use the sewer system and manholes by the City's contracts and easements with CSX.

23

88.    The public interest strongly favors allowing the City to access, maintain, repair, and use the sewer system and manholes to prevent a catastrophic failure of the sewer system, the flooding of homes with untreated sewage, and the loss of water and sewer service to a substantial portion of the City of Cumberland.

89.    CSX would suffer only modest, temporary impacts, if any, from the City's work on the sewer lines and manholes and such work would not materially interfere with CSX's operations.

90.    The City is entitled to an injunction to prevent CSX from denying the City access to the Yard to (1) locate and assess the condition of the manholes and sewer lines on and beneath the Yard and (2) perform the CIPP installation work, and associated work to the manholes, necessary to repair the sewer lines and manholes.

**COUNT V:**
**ALTERNATIVE CLAIM FOR DAMAGES**
**TO BUILD A NEW SEWER LINE**

91.    The City incorporates by reference the allegations of Paragraphs 1-90 above as if restated here in full.

92.    Pursuant to the contracts and easements with the B&O, the Aviretts, and Pen-Mar Brick, CSX has entered into contracts and utility easements with the City that, among other things, grant the City the right to access, maintain, repair, and use the sewer lines and manholes on and beneath the Yard.

93.    CSX has breached those contracts and easements by constructing the Yard in a manner that materially impairs the City's ability to access, maintain, and use the sewer lines and manholes, despite knowledge of the City's easement rights to access, maintain, and use the sewer lines and manholes.

24

94.     CSX has breached those contracts and easements by denying the City access to the Yard so the City can perform necessary maintenance and repairs to the sewer lines and manholes and prevent a catastrophic failure of the sewer system.

95.     CSX has breached the covenant of good faith and fair dealing implied into contracts and easements as a matter of law by constructing the Yard in a manner that materially impairs the City's ability to access, maintain, and use the sewer lines and manholes, despite CSX's knowledge of the City's easement rights to access, maintain, and use the sewer lines and manholes.

96.     CSX has further breached the covenant of good faith and fair dealing implied into contracts and easements as a matter of law by denying the City access to the Yard to perform necessary maintenance and repairs to the sewer lines and manholes and telling the City instead that it must abandon the existing sewer lines and manholes on and under the Yard, obtain a new easement from CSX, and construct new sewer lines and manholes elsewhere on CSX's property, all solely due to the manner in which CSX built the Yard despite its knowledge of the City's easement rights to access, maintain, and use the sewer lines and manholes.

97.     CSX's conduct, including its demand that the City build a new sewer line rather than repair the existing lines, is a repudiation of its contracts and easements with the City by renouncing its obligations to allow the City to access, maintain, repair, and make continued use of the sewer lines and manholes as required by the B&O, Avirett, and Pen-Mar Brick easements.

98.     If the Court declines to enter an award of specific performance or issue an injunction to allow the City to access and repair the sewer lines and manholes, the City seeks damages from CSX in the additional amount of money the City would need to design and construct a new sewer line and manholes, including all costs of acquiring rights of way from CSX and other property owners, costs of design, construction, and permitting, and any consequential damages the

City may incur as a result of the additional time and work it would take to perform that work instead of repairing the existing sewer lines and manholes in an amount to be proven at trial but believed to exceed $28 million.

WHEREFORE, the City respectfully requests this Court to:

1)      Issue a declaratory judgment that the City has rights pursuant to contract, express easements, prescriptive easements, and/or an easement by necessity to access to the Yard to (1) locate and assess the condition of the manholes and sewer lines on and beneath the Yard; (2) perform the CIPP installation work, and associated work to the manholes, necessary to repair the sewer lines and manholes. (3) require CSX to cooperate with the City to perform that work.

3)      Issue an order of specific performance requiring CSX to give the City access to the Yard to (1) locate and assess the condition of the manholes and sewer lines on and beneath the Yard and (2) perform the CIPP installation work, and associated work to the manholes, necessary to repair the sewer lines and manholes.

4)      Issue a temporary, preliminary, and/or permanent injunction to prevent CSX from denying the City access to the Yard to (1) locate and assess the condition of the manholes and sewer lines on and beneath the Yard and (2) perform the CIPP installation work, and associated work to the manholes, necessary to repair the sewer lines and manholes.

5)      Award the City damages, both direct and consequential, in an amount to be determined at trial as a result of CSX's construction of the Yard in a manner that has impaired the City's ability to access, maintain, and use the sewer lines and manholes as provided in the B&O Agreement, the Pen-Mar Brick Easement, and

the Avirett Easement.

6)      In the alternative, award the City damages, both direct and consequential, in an amount to be determined at trial but believed to exceed $28 million, caused by CSX's breach and repudiation of its contracts with the City by requiring the City to abandon the existing sewer lines and manholes and to construct a replacement system of sewer lines and manholes.

7)      Grant such other relief as is just, equitable, and proper, including attorneys' fees to the extent permitted by law.

Respectfully submitted,

The Mayor and City Council of Cumberland

By: ___/S/_____

W. Eric Pilsk, Bar No. 23073
Charles A. Spitulnik (application for
    admission forthcoming)
KAPLAN KIRSCH LLP
1634 I Street, NW
Suite 300
Washington, DC 20006
Tel: (202) 955-5600
Fax: (202) 955-5616
epilsk@kaplankirsch.com
cspitulnik@kaplankirsch.com

Michael Scott Cohen, Bar No. 11068
AIS No. 9212150123
City Solicitor
CITY OF CUMBERLAND
213 Washington Street
Cumberland, MD 21502
Tel: (301) 724-5200
mike@msclawllc.com

Dated: July 10, 2025